**THOMAS D'AMORE**, OSB No. 922735
Email: tom@damorelaw.com
**S. MICHAEL ROSE,** OSB No. 983388
Email: Michael@damorelaw.com
**D'AMORE LAW GROUP, P.C.**
4230 Galewood Street, Suite 200
Lake Oswego, OR 97035
Telephone: (503) 222-6333
Facsimile: (503) 224-1895

**NICHOLAS A. KAHL,** OSB No. 101145
Email: nick@nickkahl.com
290 SW Oak Street, Suite 400
Portland, OR 97204
Telephone: (971) 634-0828
Facsimile: (503) 227-6840

John E. Herrick (*pro hac vice*)
Email: jherrick@motleyrice.com
Motley Rice, LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: (971) 634-0828
Facsimile: (503) 227-6840

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| COUNTY OF CLACKAMAS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., *et al.* | Case No.: 3:17-cv-00969-MO <br><br> SECOND AMENDED COMPLAINT <br><br> Fraudulent Misrepresentation/Fraud, Deceit, Unjust Enrichment/Quasi-Contract |



Defendants.

_____

MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.,

Defendant/Third-Party Plaintiff.

v.

FEDERAL HOME LOAN MORTGAGE
CORPORATION and FEDERAL NATIONAL
MORTGAGE ASSOCIATION,

Third-Party Defendants.

Jury Trial Requested

Plaintiffs County of Clackamas, County of Clatsop, County of Coos, County of Crook,

County of Jackson, County of Josephine, County of Klamath, County of Lane, County of Linn,

County of Marion, County of Washington, and County of Yamhill ("Counties" or "Plaintiffs")

allege:

## I.    INTRODUCTION

1.

This action is brought by the Counties to recover fees that should have been paid to them

to secure the benefits from properly recording security interests in mortgages and deeds of trust,

but avoided through Defendants' unlawful conduct, disgorgement of unjust profits retained by

Defendants, and compensation to rectify the errors in the Counties' property records caused by

Defendants and restore accurate public land records in the Counties.

2.

As described more fully below, MERS, or the Mortgage Electronic Registration Systems,

was a byproduct of (and handmaiden to) the system of securitizing mortgages that allowed

lenders to make and then rapidly sell mortgages to other financial institutions, which in turn

D'AMORE
LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

packaged them into residential mortgage backed securities (or "RMBS"). As the financial

collapse of 2007 made clear, mortgage lenders, including Defendants, benefited from

securitizations because it allowed them to off-load highly risky mortgages, rather than keep them

on their books, and to turn them into highly profitable financial instruments. In the securitization

process, mortgages (and, separately, the servicing rights associated with the mortgages) were

often sold over and over again.

3.

Before MERS, each transaction would have required the buyer of the mortgage or

servicing rights to record the transfer with the county clerk in order to perfect its interest. This

system protected the buyer against other, later potential claimants, but also ensured a public

record of land ownership that accurately reflected the interests in each property in the County.

However, to avoid the relatively modest expense and delay of recording each transfer, the

Shareholder Defendants created MERS. Through MERS, a bank had only to transfer the

mortgage (or other change in ownership) once, into MERS. The bank listed MERS as the

beneficial owner of the mortgage and MERS recorded the mortgage in its own name. Then the

mortgage (or servicing rights) was transferred among MERS members without recording the

changes. Thus, for example, regardless of whether Bank of America, Wells Fargo, and JPMorgan

Chase actually owned the mortgage, MERS appeared in public records as the mortgage holder.

Defendants took a free ride, obtaining the protection and priority associated with the fraudulent

recording, without paying any recording fees to the Counties, at the expense of a transparent and

accurate public record system. MERSCORP and MERS further benefited by receiving

membership fees, transaction fees, and other monetary benefits by allowing MERS Members and

shareholders to use MERS as mortgagee of record, and tracking transferring mortgages among



MERS Members on the MERS system, and by obtaining a higher value on its securitized loan products. While Defendants benefited, the Counties, and homeowners, who could not rely on the public records to identify their mortgage holder or servicer in order to resolve a foreclosure or work out a modification, bore the costs of Defendants' scheme.

4.

While Defendants' work-around could pass muster in some other states, it violated clear Oregon statutory and case law that requires that the beneficial owner hold the actual financial interest in the property. Defendants first deliberately ignored this law, and then tried unsuccessfully to change it, but never complied with it. Multnomah County brought a similar action on December 20, 2012, surviving a motion to dismiss in the Circuit Court for the County of Multnomah, prior to settling the case. Plaintiffs, likewise, seek to hold these Defendants accountable for their unlawful scheme.

## II.  THE PARTIES

5.

Clackamas County is an existing county government duly formed under the laws of the State of Oregon and is a body politic and corporate. The Clackamas County Board of Commissioners is duly elected to exercise the powers of Clackamas County and has approved the filing of this lawsuit.

6.

Clatsop County is an existing county government duly formed under the laws of the State of Oregon and its body politic and corporate. The Clatsop County Board of Commissioners is duly elected to exercise the powers of Clatsop County and has approved the filing of this lawsuit.


D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

7.

Coos County is an existing county government duly formed under the laws of the State of Oregon and is a body politic and corporate. The Coos County Board of Commissioners is duly elected to exercise the powers of Coos County and has approved the filing of this lawsuit.

8.

Crook County is an existing county government duly formed under the laws of the State of Oregon and is a body politic and corporate. Crook County is governed by the County Court to exercise the powers of Crook County and has approved the filing of this lawsuit.

9.

Jackson County is an existing county government duly formed under the laws of the State of Oregon and is a body politic and corporate. The Jackson County Board of Commissioners is duly elected to exercise the powers of Jackson County and has approved the filing of this lawsuit.

10.

Josephine County is an existing county government duly formed under the laws of the State of Oregon and is a body politic and corporate. The Josephine County Board of Commissioners is duly elected to exercise the powers of Josephine County and has approved the filing of this lawsuit.

11.

Klamath County is an existing county government duly formed under the laws of the State of Oregon and is a body politic and corporate. The Klamath County Board of Commissioners is duly elected to exercise the powers of Klamath County and has approved the filing of this lawsuit.

D'AMORE LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

12.

Lane County is an existing county government duly formed under the laws of the State of Oregon and is a body politic and corporate. The Lane County Board of Commissioners is duly elected to exercise the powers of Lane County and has approved the filing of this lawsuit.

13.

Linn County is an existing county government duly formed under the laws of the State of Oregon and is a body politic and corporate. The Linn County Board of Commissioners is duly elected to exercise the powers of Linn County and has approved the filing of this lawsuit.

14.

Marion County is an existing county government duly formed under the laws of the State of Oregon and is a body politic and corporate. The Marion County Board of Commissioners is duly elected to exercise the powers of Marion County and has approved the filing of this lawsuit.

15.

Washington County is an existing county government duly formed under the laws of the State of Oregon and is a body politic and corporate. The Washington County Board of Commissioners is duly elected to exercise the powers of Washington County and has approved the filing of this lawsuit.

16.

Yamhill County is an existing county government duly formed under the laws of the State of Oregon and is a body politic and corporate. The Yamhill County Board of Commissioners is duly elected to exercise the powers of Yamhill County and has approved the filing of this lawsuit.

D'AMORE LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

17.

Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is a foreign corporation created in or about 1990, set up under the laws of Delaware, and doing sustained, continuous business activity in Multnomah County, Oregon.

18.

Defendant Merscorp Holdings, Inc. ("MERSCORP"), previously Merscorp, Inc. and, prior to that, MERS, is a foreign corporation and the MERS operating company. MERSCORP claims to be the sole shareholder in MERS. MERSCORP adopted the MERS membership rules, which govern the requirements and process for registering mortgages with MERS. MERSCORP operates the MERS registry and owns all of the intellectual property associated with the registry. MERSCORP employs all of the employees at MERSCORP/MERS; MERS itself has no employees. MERSCORP collects all of the membership and transaction fees from the MERS members. MERSCORP is the sole source of funding for MERS. From approximately October 1995 through January 1999, MERSCORP, under its prior names and through its predecessor-in-interest, was the only MERS entity in existence and performed all of the MERS functions, including being listed as the beneficiary on mortgages. MERSCORP has sustained, continuous business activity in Multnomah County, Oregon.

19.

Defendant Bank of America, N.A., doing business as Bank of America Investment Services, Inc. ("BANA"), is a foreign corporate entity. BANA has sustained, continuous business activity in Multnomah County, Oregon. BANA is a MERS member. BANA has filed, or caused to be filed, notes and deeds in the Counties that misrepresented MERS as a beneficiary of or as having an interest in real property in the Counties.

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

20.

Defendant Bank of the Cascades ("Cascades") is an Oregon chartered commercial bank. Cascades has sustained, continuous business activity in Multnomah County, Oregon. Cascades is a MERS member. Cascades has filed, or caused to be filed, notes and deeds in the Counties that misrepresented MERS as a beneficiary of or as having an interest in real property in the Counties.

21.

Defendant Bank of Oswego ("Oswego") is an Oregon chartered commercial bank. Oswego has sustained, continuous business activity in Multnomah County, Oregon. Oswego is a MERS member. Oswego has filed, or caused to be filed, notes and deeds in the Counties that misrepresented MERS as a beneficiary of or as having an interest in real property in the Counties.

22.

Defendant CitiMortgage, Inc. ("CitiMortgage") is a foreign corporate entity. CitiMortgage has sustained, continuous business activity in Multnomah County, Oregon. CitiMortgage is a shareholder in MERS. CitiMortgage also has filed, or caused to be filed, notes and deeds in the Counties that misrepresented MERS as a beneficiary of or as having an interest in real property in the Counties.

23.

Defendant Citizens Bank ("Citizens") is an Oregon chartered commercial bank. Citizens has sustained, continuous business activity in Multnomah County, Oregon. Citizens is a MERS member. Citizens has filed, or caused to be filed, notes and deeds in the Counties that misrepresented MERS as a beneficiary of or as having an interest in the

D'AMORE
LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

Counties.

24.

Defendant EverBank Financial Corp. ("EverBank") is a foreign corporate entity. EverBank, sometimes referred to as Everhome Mortgage Company or Everhome, has sustained, continuous business activity in Multnomah County, Oregon. EverBank is a shareholder in MERS. EverBank also has filed, or caused to be filed, notes and deeds in the Counties that misrepresented MERS as a beneficiary of or as having an interest in real property in the Counties.

25.

Defendant JPMorgan Chase Bank, N.A. ("Chase") is a foreign corporate entity. Chase has sustained, continuous business activity in Multnomah County, Oregon. Chase is a member of MERS. Chase has filed, or caused to be filed, notes and deeds in the Counties that misrepresented MERS as a beneficiary of or as having an interest in real property in the Counties.

26.

Defendant SunTrust Mortgage, Inc. ("SunTrust Mortgage") is a foreign corporate entity. SunTrust Mortgage has sustained, continuous business activity in Multnomah County, Oregon. SunTrust Mortgage is a shareholder in MERS. SunTrust Mortgage also has filed, or caused to be filed, notes and deeds in the Counties that misrepresented MERS as a beneficiary of or as having an interest in real property in the Counties.

27.

Defendant Umpqua Bank ("Umpqua") is an Oregon chartered commercial bank. Umpqua has sustained continuous business activity in Multnomah County, Oregon. Umpqua is a MERS



D'AMORE LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

member. Umpqua has filed, or caused to be filed, notes and deeds in the Counties that misrepresented MERS as a beneficiary of or as having an interest in real property in the Counties.

28.

Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a foreign corporate entity. Wells Fargo has sustained continuous business activity in Multnomah County, Oregon. Wells Fargo is a shareholder in MERS. Wells Fargo also has filed, or caused to be filed, notes and deeds in the Counties that misrepresented MERS as a beneficiary of or as having an interest in real property in the Counties.

29.

Defendant Willamette Community Bank ("Willamette Community") is an Oregon chartered commercial bank. Willamette Community has sustained continuous business activity in Multnomah County, Oregon. Willamette Community is a MERS member. Willamette Community has filed, or caused to be filed, notes and deeds in the Counties that misrepresented MERS as a beneficiary of or as having an interest in real property in the Counties.

30.

Defendant Willamette Valley Bank ("Willamette Valley") is an Oregon chartered commercial bank. Willamette Valley has sustained continuous business activity in Multnomah County, Oregon. Willamette Valley is a MERS member. Willamette Valley has filed, or caused to be filed, notes and deeds in the Counties that misrepresented MERS as a beneficiary of or as having an interest in real property in the Counties.

31.

Defendants MERS; MERSCORP; BANA; Cascades; Oswego; CitiMortgage; Citizens;



D'AMORE LAW GROUP     4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

EverBank; Chase; SunTrust Mortgage; Umpqua; Wells Fargo; Willamette Community; and

Willamette Valley are collectively referred to herein as "Defendants."

32.

Defendants MERS; MERSCORP; CitiMortgage; EverBank; SunTrust Mortgage; and

Wells Fargo; are collectively referred to as "Shareholder Defendants."

33.

Defendants BANA, Cascades; Citizens; Chase, Oswego; Umpqua; Willamette

Community and Willamette Valley are collectively referred to herein as "Member Defendants."

34.

As detailed below, Defendants—both Shareholder Defendants and Member

Defendants—filed, or caused to be filed, thousands upon thousands of false records in the public

land records maintained by Plaintiffs that identify MERS as a "beneficiary" or as otherwise

having a beneficial interest in real property that MERS cannot have under Oregon law.

35.

As detailed below, Defendants – both Shareholder Defendants and Member Defendants –

were instrumental in creating MERS and in participating in MERS, which could not have

worked but for their involvement. Individually and together, Defendants were responsible for the

filing of false records in the public land records as a result of MERS' false scheme.

### III. FACTS

36.

In Oregon, mortgage and deed records are public records. The maintenance of accurate

public records is a matter of public concern. The Counties have the responsibility to maintain

accurate public records, including accurate property records and indexes.


4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

37.

In order to perform their statutory duties of maintaining accurate property records and indexes, the Counties expend funds for purposes that include employing clerks to record and maintain the land records, contracting with third-parties to provide relevant software and internet resources, purchasing supplies necessary for the maintenance of the public indexes, and insuring the relevant public records.

38.

Public accessibility to accurate property records and indexes has long been and continues to be essential to the value and purpose of the public record as created and maintained by the Counties. The Counties provide access to and interface with many different types of people and businesses that need accurate and publicly available information to accomplish their important and necessary functions. In addition to lenders, borrowers, and purchasers of homes, public property records and indexes are relied upon and used by parties such as realtors, surveyors, utility companies maintaining easement rights, inspectors tracing responsibility for code violations and repairs, parties needing to investigate covenants and restrictions on land use, parties needing to determine the existence of tax liens or other encumbrances on the property, parties needing to trace ownership rights, and any party seeking to locate a property's chain of title.

39.

The Counties are entitled to collect filing fees for recording services, including for the recording of property records. The Counties provide an official designation or stamp to demonstrate that the recorded document is officially part of the public record maintained by the Counties.

D'AMORE
LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

40.

In fulfilling their duties to maintain accurate public property records and indexes, the Counties rely on the truthfulness and accuracy of the documents presented for recording.

41.

The Counties, through the offices of the county clerks, are required to record properly submitted deeds, mortgages, contracts affecting property, and assignments.

42.

The Counties, through the offices of the county clerks, are required to maintain separate books for the recording of deeds and mortgages.

43.

The Counties, through the offices of the county clerks, are required to keep safe and preserve all files and records of deeds and mortgages of real property, and any other records affecting real property required or permitted by law.

44.

The Counties, through the offices of the county clerks, are required to create indexes for and based upon all filed property records, including mortgages and deeds. The records are created and maintained by the Counties' personnel at the Counties' expense and are the property of the Counties.

45.

In the most common residential lending scenario, there are two parties to a real property mortgage: a lender (the mortgagee) and a borrower (the mortgagor). When a mortgage lender loans money to a home buyer, it obtains two documents: (1) a promissory note in the form of a negotiable instrument from the borrower and (2) a mortgage or trust deed granting the mortgage

D'AMORE
LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

lender a security interest in the property as collateral to repay the note. The mortgage or trust deed, as distinguished from the note, establishes the lien on the property securing repayment of the loan. In Oregon, as elsewhere, the note cannot be separated from the mortgage or trust deed.

46.

Deed records in Oregon were created to provide public notice of the identity of the person whose interest is protected by a mortgage or deed of trust. Once properly recorded with the county, a mortgage or deed of trust notifies all persons of the existence of the instrument, protects the lender's security interest, establishes a lender's right to receive legal notice regarding the property, and places subsequent purchasers on notice that the property is encumbered by a security interest. These benefits of recording are commonly referred to as perfection, priority, and public notice.

47.

The Counties confer a benefit on parties engaging in land transactions by maintaining their respective recording systems, including its indexes. For example, the Counties provide constructive notice of an interest in real property by indexing the beneficiary of a deed of trust. ORS 93.643(1) sets forth that in order to "give constructive notice of an interest in real property, a person must have documentation of the interest recorded in the indexes maintained under ORS 205.130 in the county where the property is located. **Such recordation, and no other record, constitutes constructive notice to any person of the existence of the interest**." (emphasis added).

48.

Defendants reap the benefit of the Counties' recording systems even though, by way of their scheme, they do not pay any fees to the Counties when a note and its accompanying



4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

security interest are subsequently transferred between MERS members. Instead, MERS members

pay membership fees and transfer costs to MERS. Defendants further benefit from the public

recording system maintained by the Counties as it allows them to record a mortgage assignment

in order to comport with Oregon's requirements for foreclosure proceedings.

49.

The Counties provide a service of officially recording and making available legally

sufficient public notice of real property liens in exchange for a fee. This service is known as

"perfecting."

50.

Under Oregon law, in order for an interest in a property to be perfected and have the

highest possible priority against others, it must be recorded.

51.

A recorded "first-lien" security interest (a "perfected security interest") cannot be

assigned or transferred by operation of law; it must be recorded. An assignee wishing to obtain

or maintain a priority interest in a perfected security instrument must record in order to do so. By

maintaining the recording system in Oregon, the County confers a benefit on Defendants, which

is recognized by Defendants. Defendants concede that you cannot have MERS without the

existing recording system ("The MERS system couldn't exist if the recording system didn't

exist."); that MERS has to be able to record in its own name in the existing recording system or

MERS doesn't work ("We are the mortgagee of record and there has to be a place for us to

establish that."); and that the MERS business model is based on Defendants obtaining and

maintaining the benefits of recording without having to actually record or pay fees to Plaintiffs

when a note and its accompanying lien interest or service agreement are transferred between

D'AMORE
LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

MERS membership fee-paying members.

52.

Outside of the scheme concocted by MERS and Shareholder Defendants, in the traditional residential mortgage model intended by the Oregon legislature, a person seeking to finance the purchase of a residential property can obtain a loan from a lender in exchange for a promissory note that commits the buyer to repayment. The right to repayment is conveyed through the promissory note. As security, the borrower provides the lender with a trust deed, which creates a lien on the property that the beneficiary can foreclose on if the grantor defaults on the loan. This is typically recorded in order to perfect the lender's security interest through public notice and to ensure the maintenance of a complete and accurate public record of the chain of title. When such a loan, secured by a mortgage or trust deed, is sold, the new party-in-interest records the transfer of the mortgage or trust deed in order to legally protect its security interest (priority and perfection) and to receive legal notice. This can occur multiple times during the life of a mortgage loan and multiple transfers are recorded to ensure lien priority and provide public notice of the proper servicer and/or note-holder in the land records in the county clerk's office. This basic model, which has been followed throughout the United States for over three hundred years to provide the public with notice of the ownership of, and liens encumbering, real property throughout the United States, is still followed by parties who are not members of MERS and by MERS Members themselves in transfers involving non-MERS members.

53.

Defendants circumvented the long-established legal requirements associated with the recording of assignments or transfers of interests in real property. Defendants improperly claimed that MERS has a recordable interest (which it does not), the ability to hold and transfer



legal title in security instruments (which it does not) and the ability to hold and transfer perfected and priority security interests on behalf of its members (when no such interests exist absent valid recording). In so doing, Defendants recorded or caused to be recorded false instruments. As a result, Defendants undermined the public recording system of counties throughout Oregon, including the Counties, via a pattern and practice of violating the laws of Oregon.

54.

Defendants violated and continue to violate Oregon statutory and common law by:

a.      Recording, causing to be recorded or approving the recording of instruments that falsely state that MERS has a lien upon or interest in real property that MERS does not have, with the intent to cause MERS to be indexed as a "grantee" or "mortgagee" or "beneficiary" in the statutory indexes maintained by the Counties;

b.      Releasing, transferring, assigning, or taking other action relating to an instrument that is filed, registered, or recorded in the offices of the county clerks without a recordable interest and actual authority to release, transfer, assign or take any other action relating to an instrument that is filed, registered, or recorded in the offices of the county clerks. The designation of MERS as "nominee" and (as of April 2014) the holder of a "nominee interest" in the deed of trust is not factually or legally accurate (MERS was not and is not a nominee and there is not a "nominee interest" in a deed of trust in Oregon) and does not result in MERS having the requisite authority to record, transfer, assign, or release interests in connection with loans registered on the MERS system;

c.      Unlawfully using the Counties' recording systems to falsely represent to the public and to investors that mortgages and deeds of trust recorded in the name of MERS and then transferred or assigned after their initial recording by operation of law to new

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

beneficial owners obtained and maintained priority first-lien status as to each new beneficial owner under Oregon law and are therefore qualified mortgages for purposes of securitization.

55.

Each Defendant was an active participant in the misconduct alleged herein and each Defendant had an independent obligation to ensure that their conduct is consistent with Oregon law.

**A.    MERS.**

56.

The mortgage industry created MERS to facilitate the growing industry practice of selling residential mortgages for securitization in complex investment vehicles known as residential mortgage backed securities ("RMBS"). Creating RMBS depended upon the ability to quickly sell and transfer mortgages, often over and over again. Traditionally, each of these transfers would require that the new owner of the mortgage record its interest in the note, paying recording fees required to update the public record and perfect and prioritize its interest in the property subject to the mortgage.

57.

In 1994, prior to the foundation of MERS, mortgage bankers engaged Ernst & Young to conduct a study to determine how much money they could avoid paying to counties for the recording of land deeds through MERS. The Ernst & Young report indicated that "MERS could save the [mortgage] industry about $77.9 million annually.[1]

---

[1] Phyllis K. Slesinger & Daniel McLaughlin, *Mortgage Electronic Registration System*, 31 Idaho L. Rev. 805, 811–812 (1995) (citing Ernst & Young LLP, *MERS Cost Benefit Analysis* (Dec. 1994).



4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

58.

"The basic legal feasibility and legal architect" of the "MERS program" was and is based entirely on a single legal assumption: that MERS can be the mortgagee or beneficiary of record under Oregon law with the ability to hold and transfer legal title. MERS takes that position that as mortgagee, MERS assures the priority of the original first lien is preserved while eliminating the need to record each transfer of the beneficial ownership of a mortgage in the local land records. By designating MERS as the original mortgagee of record, the holder(s) will avoid recording assignment of mortgages. MERS' creators use "mortgagee" and "mortgagee of record" synonymously and interchangeably.

59.

In 1995, MERS' own creators acknowledged and conceded the potential flaw in the business model, that if "there is some barrier to MERS' serving as Mortgagee in one or more states, MERS will not be able to operate with respect to mortgages on properties in any such state." MERS and Shareholder Defendants deliberately chose not, at that time, to "attempt to effect change through either the judicial or legislative process."

60.

In a deposition in 2009, R.K. Arnold, the former President and CEO of MERSCORP and MERS, testified that, based on the estimate that there were 62 million mortgage loans on the MERS System, the mortgage lending industry had saved 2.4 billion dollars by using the MERS System.

61.

MERS Members pay annual membership fees for the right to register mortgage loans on the MERS System, a registration fee to register a mortgage loan on the MERS System, and transaction fees for other services performed on the MERS System,

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

**B.**    **As Designed and Implemented in Oregon, MERS Is an Economic and Legal**

   **Stranger to the Mortgage Transaction and Has No Recordable Interest.**

62.

As conceded by MERS' then CEO, R.K. Arnold, there is no economic or legal reason for

acts to be conducted in the name of MERS other than the fact that MERS has designated itself as

mortgagee or beneficiary of record. This becomes evident when one understands MERS'

admitted role (or lack thereof):

   a.    MERS is not a lender; MERS does not extend credit or provide funding for any

mortgage loan.

   b.    MERS has no interest at all in the promissory note evidencing the mortgage loan.

MERS is not the owner of the promissory note secured by the mortgage and has no rights

to the payments made by the debtor on such promissory note.

   c.    MERS does not collect or distribute payments. MERS has no financial or other

interest in whether or not a mortgage loan is repaid.

   d.    MERS is not the owner of the servicing rights relating to the mortgage loan and

MERS does not service loans.

   e.    MERS cannot exercise, and is contractually prohibited from exercising, any of the

rights or interests in the mortgages or other security documents and has no rights

whatsoever to any payments made on account of such mortgage loans, to any servicing

rights related to such mortgage loans, or to any mortgaged properties securing such

mortgage loans.

D'AMORE
LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

     f.     The beneficial interest in the mortgage (for the person or entity whose interest is secured by the mortgage) runs to the owner and holder of the promissory note. MERS is not and never has been the person for whose benefit a trust deed is given.

**C.**    **MERS Must Be (But Cannot Be) The Mortgagee or Beneficiary.**

63.

In October 1993, the Mortgage Bankers Association Interagency Technology Task Force drafted a "white paper" entitled "Whole Loan Book Entry Concept for the Mortgage Finance Industry." This paper was authored by Phyllis Slesinger (a former MERS executive officer) and Dan McLaughin (then an officer of MERS and MERSCORP). This paper made clear that any entity formed to accomplish transfers of perfected priority security liens without recording their assignments would have to be the "mortgagee of record" under state law and capable of holding and transferring the lien interest.

64.

According to the creators of MERS, the idea of using a registration process where the electronic clearinghouse (MERS) was not the mortgagee of record was considered and rejected. MERS and its participants had to claim that MERS was the mortgagee or beneficiary of record and it had to be capable of holding legal title to the mortgage or deed of trust or MERS does not work. "Only by making the clearinghouse (MERS) the mortgagee of record can we eliminate the need for paper mortgage assignments. With legal title vested in the clearinghouse, other interests—the security interest of the warehouse lender, a mortgage banker's servicing interest, an investor's equitable ownership interest—can be registered with the clearinghouse without the need to execute and/or record assignments."

**D'AMORE LAW GROUP**    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

65.

When it came to the legal issues facing MERS, its designers stated that "if the concept is really going to work, the system will have to be clearly grounded in current state and local jurisdiction laws and the legal requirements of the local land record office regarding assignments and releases." MERS would have to be able to "operate within the existing framework of real estate law, rather than attempt to effect change through either the judicial or legislative process."

66.

In December 1994, Ernst & Young, LLP performed a Cost Benefit Analysis for MERS which, upon information and belief, listed a number of "legal concerns" for MERS' consideration.

67.

On August 22, 1995, Tenex (10X) Consulting was engaged by the MERS Steering Committee to develop the Request for Proposal to select the Technology Providers for the MERS System and conduct an evaluation of the MERS business plan. In its analysis of the MERS business plan under the section entitled, "Risk and Benefits for Investors," Tenex recognized and conceded that the entire MERS business model was based on a single assumption and that assumption had to be correct (legal) in every state in which MERS wanted to do business. "The MERS financial model is based on the assumption that it will be possible for MERS to serve as Mortgagee of record in every state." The report then stated, "[a]lthough the Steering Committee members know of no reason for this not to be the case, MERS is unable to undertake the formal legal review necessary to confirm this until after MERS has received the initial installments of investor contributions. If the legal review indicates that there is some barrier to MERS serving as Mortgagee in one or more states, MERS will not be able to operate with respect to mortgages on

D'AMORE
LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

properties in any such state." Once again MERS uses "mortgagee" and "mortgagee of record" synonymously and interchangeably.

68.

The analysis goes on to express concern over adverse business and investment effects any such legal "barrier" would have. "Depending on the volume of mortgage transactions in any such state, MERS' inability to offer its services could significantly reduce business volumes and significantly slow the rate at which members/users decide to use MERS. This would reduce MERS' receipt of both membership and transfer fees, and might cause MERS to be unable to pay investors the amounts due them or to significantly delay such payments. In addition, this could cause MERS to significantly reduce the investors' return on their investments."

69.

On October 16, 1995, without having determined and confirmed the legality or validity of its business model, Mortgage Electronic Registration System, Inc. was incorporated in Delaware.

70.

MERS had already decided to do business in all fifty (50) states but conceded they would eventually need to obtain a "validating legal opinion".

71.

In order to obtain the requisite "formal legal review" and "validation," MERS turned to the law firm of Covington and Burling for a legal analysis. Thereafter, Shareholder and Member Defendants carelessly and improperly relied on MERS' representations that due diligence had been done regarding the legality of the MERS business model in Oregon. To date, there has been no indication that any Shareholder Defendant or Member Defendant conducted any independent legal analysis of MERS regarding the legality of the MERS business model in Oregon. On June

1, 1996, Covington and Burling sent an unsigned memo to R.K. Arnold (at the time V.P. and General Counsel of MERS) relating to the "basic legal feasibility and legal architecture of the MERS program." Despite MERS' recognized need for a legal opinion confirming MERS' ability to be mortgagee or beneficiary in every state, the memo clearly states that the summary being provided to MERS "did not constitute an opinion of the law." The memo acknowledges that the question of whether MERS wishes to seek an actual legal opinion on some or all of the issues would have to be addressed at a later date. "Because MERS has not yet decided whether it is worthwhile to seek opinion from counsel in individual states, you and we agreed that we should await that decision before drafting a proposed form of opinion for MERS to seek from local counsel. Such a draft can be prepared expeditiously when and if MERS so requests."

72.

If Covington and Burling, or any of the Defendants had actually looked at Oregon law in 1996–1997, they would have known that Oregon had: (1) a statutory definition of beneficiary from 1959; (2) case law on how to interpret a statute in Oregon; (3) the legislative history of the statute; (4) binding case law from 1988 that a "beneficiary" under the Oregon Trust Deed Act ("OTDA") must be the party that owns the note, namely the lender or its successors; (5) case law dating back to 1921 that a note and its security may not be assigned to separate parties and that an attempt to make one party the note holder and another the beneficiary would nullify the note; and (6) case law dating back to 1927 that the law of the land (and thus that the OTDA and its definition of "beneficiary") are part of any valid contract and must be read into the contract in order to fix the rights and obligations of the parties.

D'AMORE
LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

**D.      The MERS Scheme could not work without county recording and it was an anticipated risk that this may violate state laws.**

73.

The Covington & Burling memo underscores the fundamental legal premise that MERS now seeks to deny: that recordation is critical to ensuring priority. Specifically, the Memo advises that if MERS wants to "ensure that the priority of the original first lien is preserved while eliminating the need to record each successive assignment of the mortgage," then MERS must be able to be the "mortgagee of record." The memo clearly warns MERS that "the risk that state law will be construed to bar MERS from serving as mortgagee of record . . . would be the type of risk for which MERS itself would be responsible and MERS accordingly will wish to assess them."

74.

The memo states "[a]s you understand these are generalizations about state law in these areas" for the ten (10) states discussed. For the remaining states, including Oregon, MERS could proceed to obtain actual legal advice by obtaining individual opinions from counsel in each state; or MERS could, as a more limited measure, direct Covington and Burling to expand its non-legal opinion to include some or all of the additional states. MERS chose to have Covington and Burling expand its non-legal opinion in all states, including Oregon.

75.

Conspicuously absent from Covington and Burling's memo is any actual discussion or analysis of the underlying legal premise of the MERS business model. Despite MERS' creators' repeated use of the terms "mortgagee" and "mortgagee of record," the memo contains no analysis of MERS' legal ability to be either. Nor, as noted above, is there any specific statutory analysis of whether MERS meets the statutory definition of "beneficiary" in Oregon and no

D'AMORE
LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

research of then-existing Oregon case law.

76.

It is clear from the Covington and Burling memo that MERS, Shareholder Defendants, and their advisors were aware of the OTDA and aware that it contained specific statutory definitions of the parties involved in the three party transaction. MERS and Shareholder Defendants were aware that OTDA governs the definition of "beneficiary" and yet they took steps that were flatly contrary to the letter of the statute by listing MERS as beneficiary in form deeds of trust filed in Oregon.

77.

MERS, Shareholder Defendants, and their advisors could easily have performed a complete analysis to include the statutory definition of "beneficiary" that was in the same section of the OTDA as the definition of "trustee," which they did review. However, based on MERS' lack of any economic or legal interests in the mortgage transaction and based on the longstanding definition of beneficiary in Oregon, any competent analysis of Oregon law that started with whether MERS could be a beneficiary (given its role in the transaction) would have concluded that MERS is not (by definition) a party for whose benefit the trust deed was given. Rather than follow this legally obvious and straightforward path and risk disqualifying itself by its own analysis, MERS and Shareholder Defendants chose to ignore the statutory definition and find another way around the prohibition.

78.

By improperly relying on the Covington and Burling memo, MERS tried to end-run the OTDA by claiming that, even though MERS was an entity that was not and could not be a mortgagee or beneficiary by statutory definition, MERS could, nevertheless become a

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

"mortgagee of record" by contractual designation in Oregon. However, that was not a matter the memo sought to address. The memo makes no effort to explain or explore the glaring legal questions associated with MERS' plan to vest a legal and economic stranger to the loan transaction with the statutory powers and authority of the beneficiary. For example there is no discussion or analysis of whether parties can contract around statutory definitions. There is no indication that any effort was made to locate or analyze then existing Oregon case law that specifically required all contracts to follow the existing law of the land. Such analysis would have obviously lead back to an analysis of the statute, its purpose and whether you can contract around it. In addition, there is no discussion or analysis of whether parties can contract to create legal status by mere recitals (i.e., agency/nominee); no discussion or analysis regarding the legal differences between mortgagee and mortgagee of record; no discussion or analysis of how a party with no economic or legal interests in the mortgage transaction can record an interest in its own name, let alone hold legal title; no discussion or analysis of whether MERS was actually going to be acting as an agent or nominee in light of the failure to establish MERS as the agent of Shareholder Defendants, and no discussions regarding contract issues such as consideration and the statute of frauds.

79.

The memo's sole focus was whether MERS was expressly "barred" by existing state law from being mortgagee or beneficiary of record, not whether MERS was authorized to be mortgagee or beneficiary by definition or was permitted by existing state law to act as mortgagee or beneficiary by designation. This distinction is evident in the risk analysis and disclaimer provided by Covington and Burling. Because no analysis of Oregon law was included on any of these issues, the memo claims no legal authority was found to either prohibit or permit what

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

MERS was going to do in Oregon.

80.

The memo provided a clear disclaimer and yet another warning as to the risks associated with MERS' plan. "MERS like many ventures in the field of electronic commerce presents issues that are not explicitly addressed by existing law. In other words; when the law is silent, the absence of a specific prohibition may provide the opportunity for MERS to proceed with its business plans, while the absence of a specific authorization requires MERS to proceed with risk." But the law in Oregon was not "silent." It was intentionally overlooked.  MERS and Shareholder Defendants knowingly accepted these risks of violating explicit Oregon law for their own financial benefit.

81.

On December 1, 1996, Covington and Burling sent MERS a second, unsigned memo. The memo once again informed MERS that: the summaries provided on matters such as permissibility, liability, and individual state law "do not constitute opinions on the law;" the analysis provided was based upon "generalizations about state law in these areas;" and "the assumption is, if satisfactory conclusions can be reached on these basic issues, then the MERS plan should be feasible from a legal standpoint." In other words, assuming the assumptions are correct, it might be feasible but it's your risk to take. Covington and Burling once again reminded MERS that it could proceed to obtain more definitive advice by obtaining individual opinions from counsel in each state.

82.

On March 3, 1997, the MERS system began operation in all fifty states, including Oregon. The Counties are aware of no indication that MERS consulted a qualified Oregon



lawyer regarding MERS' ability to act as mortgagee or beneficiary of a deed of trust in Oregon

(either by definition or designation) or its ability to be the agent or nominee of its members. Nor,

based upon information and belief, did MERS seek an opinion from any County attorney or from

the Attorney General's office or seek any form of declaratory ruling. Having been fully advised

of the risks associated with the "legal assumptions" underlining its business model and having

been informed and reminded of its legal accountability if these self-serving "assumptions" were

not true, MERS nevertheless continued forward. In fact, R.K. Arnold published an article entitled

"Yes, There is Life on MERS" in the July/August 1997 issues of "Probate and Property" in

which he stated that MERS conforms to state law in all 50 states.

83.

On September 1, 1997 Covington and Burling sent MERS a third unsigned memo

regarding whether MERS could call itself the original mortgagee of record. Covington and

Burling once again did not look at the law of any specific state regarding this issue but stated that

"general principles of common law" might permit MERS to be named as the mortgagee of

record as nominee for the true note holder. Once again, Covington and Burling qualified its

analysis by stating, "the summaries reflected . . . reflect the result of our research and analysis

but do not constitute an opinion on the laws of any state". This third analysis, like its

predecessors, did not consider the nearly forty year old definition of beneficiary in Oregon, did

not look at Oregon case law, and did not look at whether MERS was or could act as a nominee

given the design, structure, and implementation of MERS and its relationship with its members.

84.

Though MERS and Shareholder Defendants chose to ignore the law in Oregon and avoid

any actual analysis of it, MERS and Shareholder Defendants nevertheless stated in deeds of



trusts filed with Plaintiffs that MERS met the statutory definition of beneficiary: "MERS is the beneficiary under this Security Instrument." This statement was not true and was not (nor could it have been) based on a determination by MERS that it actually met the statutory definition because MERS never conducted any such analysis.

85.

At the same time that MERS and its members were falsely claiming that MERS was by definition "the beneficiary under the Security Instrument" and "the grantee," MERS was also claiming that it was the beneficiary by designation in a nominee capacity. In an all-out "throw it against the wall and see what sticks" approach, MERS, over time, used each of these designations of its role and legal status—grantee, beneficiary, and nominee—in deeds of trust filed in the Counties. The inconsistent and conflicting representations contained in the deeds of trust filed by Defendants are neither factually accurate nor legally correct, but were inserted to make it facially appear that MERS had: (1) a recordable interest in its own name; (2) the ability to hold and transfer the lien interest in its own name; (3) the actual power and authority of the beneficiary (in particular, the power of sale and foreclosure); and (4) thus, a legally recognized interest in the properties that entitled it to be listed in the index of public land records.

86.

These instruments identifying MERS as a grantee, beneficiary, or nominee were executed by thousands of employees of Member and Shareholder Defendants who were identified as vice presidents or assistant secretaries of MERS, even though they were not actually employees or agents of MERS. These signers had no duties or authority at MERS other than executing assignments or other documents related to mortgages made by their bank employers, were not compensated by, did not report to, and, in fact, never communicated with MERS.

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

87.

Aware of the risks that MERS' action posed to MERS and Shareholder Defendants, MERS and its advisors devised indemnity provisions and agreements to relieve MERS of accountability by shifting legal responsibility onto the Shareholder Defendants. MERS and Shareholder Defendants clearly knew that they were risking the recording of hundreds of thousands of false and inaccurate documents which would damage and corrupt the public land records in the Counties and undermines the integrity of the County recording systems.

88.

According to MERS' counsel, in 2010, following the economic crisis and wave of resulting foreclosures, the first cases involving MERS began to make their way into Courts in Oregon. For the first time, the MERS business model was subjected to judicial review utilizing Oregon law. MERS had intentionally avoided the judicial process in creating MERS and was fully aware of the risks it had knowingly taken in 1996—"the risk that state law will be construed to bar MERS serving as mortgagee of record." On December 10, 2010, R.K. Arnold appeared before the Oregon Senate Interim Committee on Consumer Protection and Public Affairs. As part of his prepared remarks, Mr. Arnold represented that MERS had conducted an adequate review of state law prior to the creation of MERS. At n.16 to his written testimony, Mr. Arnold stated:

> A review of the use of MERS in all fifty states was done by Covington and
> Burling in 1996 and 1997 as part of the due diligence associated with the creation
> of MERS. It is available upon request.



D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

89.

In April, 2011, MERS and MERSCORP and various Shareholder and Member Defendants entered consent orders with federal regulators regarding (among other things) their use of the MERS system. Specifically, MERS and MERSCORP entered into a *Stipulation and Consent to the Issuance of a Consent Order* with the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and the Federal Housing Finance Agency (the "Federal Regulators"), in which both entities agreed to the terms of a comprehensive *Consent Cease and Desist Order* ("Consent Order").[2] The Consent Order grew out of an inter-agency review of major residential mortgage servicers and mortgage service providers and included an examination of MERS and MERSCORP, "both of which provide various services to financial institutions related to tracking and registering residential mortgage ownership and servicing, acting as mortgagee of record in the capacity of nominee for lenders, and initiating foreclosure actions."[3]

90.

The Consent Order included findings that MERS and MERSCORP "(a) have failed to exercise appropriate oversight, management supervision and corporate governance, and have failed to devote adequate financial, staffing, training, and legal resources to ensure proper administration and delivery of services to Examined Members; and (b) have failed to establish and maintain adequate internal controls, policies, and procedures, compliance risk management, and internal audit and reporting requirements with respect to the administration and delivery of

---

[2] Ex. 12 In the Matters of MERSCORP, INC., and the Mortgage Electronic Registration Systems, Inc., FHFA No. EAP-11-01 (Federal Housing Finance Agency April 13, 2011).
[3] *Id*. at 2.



4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

services to Examined Members."[4]

91.

The abuse of the public recording system and failures of the MERS System are not some hypothetical wrong—they are real and have had devastating and long-term effects upon the public recording system and the homeowners who have been its victims. The Counties' public land records no longer reflect the party with a legal interest in deeds recorded in MERS name. Indeed, one survey of foreclosure cases from six states "found that where MERS was mortgagee of record (fifty percent of cases), the plaintiff asserting the right to foreclose matched an identified 'investor' in the MERS public record only twenty percent of the time."[5] Similarly, a Bankruptcy Court in Nevada, reviewing the status of twenty-seven motions to lift stays filed by MERS, found that in six of them MERS had erroneously filed "as nominee of an entity that no longer has any ownership interest in the note."[6]

92.

While Defendants have argued elsewhere that they had no duty to record their deeds of trust, they *chose* to do so in Oregon (and elsewhere) in order to perfect and prioritize their security interests. In fact, R.K. Arnold testified as follows in a 2009 deposition:

Q. Is it your company's intent to supplant the mortgage land records of various states with its system?

A. No. We layer it on top is the way to think of it.

Q. When you say layer it on top, explain that, please.

---

[4] *Id.* at 5.
[5] Alan M. White, Losing the Paper—Mortgage Assignments, Note Transfers and Consumer Protection, 24 Loy. Consumer L. Rev. 468, 486 & n.90 (2012).
[6] *In re Mitchell*, No. BK-S-07-16226, 2009 Bankr. LEXIS 876, at *17–21 (Bankr. D. Nev. Mar. 31, 2009), aff'd, 423 B.R. 914 (D. Nev. 2009).

{ 0 0 2 6 3 7 2 5 ; 2 }
P a g e | **33 SECOND AMENDED COMPLAINT**



4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

A. Well, the MERS system couldn't exist if the recording system didn't exist.

Not only could the MERS System not function without the Counties' public land recording system, but also, their selective use of the Counties' recording system allows Defendants to represent that they have all the rights, titles, and interests to the mortgage loans or deeds of trust in the various contracts required to be executed during the securitization process, resulting in still more financial benefits for the Defendants at the Counties' expense.

Having chosen to take advantage of the Counties' public land records for their own financial gain, Defendants are now responsible for the damage they have caused to those records by inaccurately representing the real parties in interest in those properties. Equity counsels the conclusion that those who have reaped the benefits of the MERS system at the expense of the public should be held accountable.

93.

In May 2011, having intentionally avoided the use of the legislative process in connection with the creation and implementation of MERS in Oregon, MERS and Shareholder Defendants were nevertheless more than willing to try and use it in order to avoid accountability and to save their business model. On May 25, 2011, faced with adverse rulings from at least six federal courts, MERS, Shareholder Defendants, counsel, and lobbyists orchestrated the introduction of a last minute amendment to the affordable housing bill. The amendment, which was retroactive in nature, not only attempted to change the recording requirements in Oregon, it also attempted to create a new definition of beneficiary. Although the amendment failed, it confirmed that MERS and its counsel were fully aware that MERS was not a beneficiary and that courts were beginning to awaken to what had been concealed and misrepresented by attorneys for MERS and Shareholder Defendants for years. It also confirmed a continued willingness by these Defendants

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

to do whatever was necessary not to be held accountable. Again in 2018, Defendants lobbied to introduce Oregon legislation to retroactively excuse their past conduct. Again, it failed to pass.

**E.      The MERS Scheme.**

94.

When a lender joins MERS, that lender enters into an agreement with MERS to follow all of MERSCORP Inc. Rules of Membership. These Rules of Membership require lenders to provide assistance to MERS and to take such actions as may be necessary to effectuate the MERS scheme. For example, when a lender which is a "member" of MERS makes a mortgage loan, the lender instructs the title company to show not only the lender, but also MERS, as "mortgagee" under a mortgage and "beneficiary" under a deed of trust.

95.

Unless MERS <u>itself</u> is identified as a mortgagee, beneficiary, and/or grantee, MERS will not ordinarily be indexed in the deed records because MERS is a stranger to the transaction and has no recordable interest. Furthermore, unless MERS is identified in the deed records, the MERS scheme does not work because the protections and benefits of the recording statutes are not extended to MERS and MERS could not therefore claim to exercise them. However, as explained above, under Oregon law, simply listing MERS as a mortgagee, beneficiary, and/or grantee does not give MERS a legally cognizable interest in the mortgage or property subject to the mortgage; parties cannot contract around the OTDA's definition of beneficiary.

96.

To ensure that the MERS scheme can operate, Defendants simply ignore the law and falsely state in thousands of recorded instruments that MERS has a lien upon or interest in real property, which MERS does not actually have (listing MERS as the beneficiary and/or grantee

D'AMORE
LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

under the security instrument) so that MERS could improperly be entered into the public land records and illegally claim the ability to hold and/or transfer legal title.

97.

As a result, Defendants caused the Counties' land records to incorrectly reflect the status of MERS and the true party with legal interest in the property.

98.

Despite the requirements of Oregon law, MERS and Shareholder Defendants agree among themselves that:

a.    Sales or transfers of mortgage loans among MERS members will not thereafter be recorded in Plaintiff Counties' real property records;

b.    MERS will remain the grantee or beneficiary of the security interest created by the original deed of trust; and

c.    Subsequent sales or transfers among MERS members will be tracked electronically in the MERS System.

99.

Likewise MERS and Shareholder Defendants agree that the purchaser or successor servicer of the note will notify MERS at the time of acquisition that the note is paid so that MERS can purportedly release its supposed lien and the lien of the original lender.

100.

MERS admits that a transaction between a MERS member and a non-MERS member, like a transaction between two non-MERS members, must be recorded in the public record in accordance with Oregon law in order to have a priority first-lien perfected security interest.

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

101.

MERS admits that its system is specifically designed to allow its members to avoid
paying the document recording fees associated with subsequent conveyances of interests in real
property to counties, including Plaintiffs.

102.

MERS admits, as of 2007, that the MERS System had cost counties nationwide in excess
of $1 billion.

103.

Such admission of intent to evade recording of subsequent conveyances and payment of
fees to the Counties applies to all Defendants, and Defendants were aware of, approved of, and
participated in the actions of one another.

104.

The use of MERS' registry, instead of public land records, has not only degraded the use
the public land records as a means of tracking ownership interests in property in the Counties,
but has set up, in its place a private alternative recording system that is wholly inadequate.
MERS members are able, but, it seems, not required to, track subsequent assignments or
conveyances of its interests in the MERS registry, and have no incentive to do so. In the words of
MERS' former CEO, R.K. Arnold, the system "is capable of being used to track [beneficial
ownership interests] if the members utilize it for that reason." When asked whether MERS
expects financial institutions to update the MERS database to reflect such changes, MERS' CEO
replied, "not so much." MERS does not verify, update, or confirm any of the information that
appears on its system. To the contrary, it expressly disclaims that it makes no representations or
warranties regarding the accuracy or reliability of the information provided. If a MERS member

D'AMORE
LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

chooses not to use the database to reveal themselves, MERS does not take any further action.

**F.    The MERS Fiction.**

105.

According to MERS, it is the mortgagee, beneficiary, or grantee of record in more than 70 million mortgages filed in the land records of counties throughout the United States. MERS, however, does not actually have a security interest in the real property that is the subject of such mortgages or deeds of trust.

106.

Despite Defendants' affirmative misrepresentation to the contrary, MERS was not, is not and cannot be a beneficiary of a deed of trust in Oregon

107.

Despite Defendants' affirmative misrepresentation to the contrary, MERS was not, is not and cannot be a beneficiary of record of a deed of trust in Oregon.

108.

Despite Defendants' affirmative misrepresentation to the contrary, MERS was not, is not and cannot be a beneficiary as nominee of a deed of trust in Oregon.

109.

Despite Defendants' affirmative misrepresentation to the contrary, MERS does not have a nominee interest in the deed of trust.

110.

Despite Defendants' affirmative misrepresentation and action to the contrary, MERS does not have a recordable interest in the deed of trust.



D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

111.

MERS has no beneficial interest in a deed of trust in Oregon.

112.

MERS cannot hold or transfer legal title to a deed of trust in Oregon and its attempts to do so are invalid and a nullity.

113.

MERS is not an agent or nominee by virtue of any agreement made between MERS and its members, by any deed of trust, or by any other means. The MERS agreement does not grant MERS authority to assign any of the mortgages of its thousands of members. Assuming MERS could establish that some mechanism exists that purports to designate MERS as an agent or nominee, Oregon law does not allow MERS to be the agent of the thousands of banks that are its members/principals (who, circularly, execute and file instruments not through MERS but through their own employees, designated as MERS secretaries or vice presidents). Even assuming that MERS has been designated an agent for the banks (which it has not), and assuming that Oregon law allows MERS to serve as agent for the thousands of banks at issue (which it does not), Defendants systematically failed to record thousands of transfers of mortgages or trust deeds on behalf of the banks, as required under Oregon law to perfect and prioritize the principals' security interests. It follows that subsequent note holders have not obtained perfected priority lien interests because the conveyances of those lien interests have not been recorded with the county clerk.

**G.    MERS and the Securitization of Residential Mortgage Backed Securities ("RMBS").**

114.

Residential Mortgaged Back Securities ("RMBS") are securities that derive their cash



4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

flow from pooled residential mortgages. Holders of RMBS receive the principal and interest payments from borrowers on a particular pool of mortgage loans.

115.

Driven by potential for staggering profits, Defendants became involved in the business of selling RMBS.

116.

RMBS cannot be created without the transfer of loans. At minimum, a loan must be transferred from the loan originator to the depositor and then transferred again from the depositor to the trust. This means at least two loan transfers are necessary to create an RMBS.

117.

To issue an RMBS, the issuer was and is required by law and industry standards to record (and pay recording fees on) every conveyance of a mortgage loan from origination through deposit in a securitization trust. Only through recordation can each of the pooled loans have a priority first-lien security interest—a perfected security interest that is of value to investors in the RMBS.

118.

Thus, filing mortgages and mortgage assignments and transfers in the public record is a critical and contractual precondition to residential mortgage securitization.

119.

Yet, the inconvenience, expense, and time associated with filing the documents necessary to maintain a first-lien priority when a note and its accompanying lien are transferred between parties frustrated Shareholder Defendants' ability to rapidly and massively securitize residential mortgage loans.

D'AMORE
LAW GROUP     4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

120.

To facilitate the issuance of RMBS, Shareholder Defendants needed to increase the speed with which mortgages could be bought and sold. Shareholder Defendants needed to create a mechanism that would enable it to buy and sell mortgages and mortgage servicing rights multiple times without the inconvenience, expense, or time associated with recording each transfer in the public record.

121.

Faced with the inconsistent needs both to perfect and prioritize the security interests of each pooled mortgage through public recordation and to conveniently, cheaply, and rapidly transfer mortgages, Shareholder Defendants simply wrote their own rules and created MERSCORP and MERS.

122.

Through MERS, Shareholder Defendants purportedly created a system through which priority perfected security interests could be transferred without the need for public recording.

123.

Two features of RMBS, in particular, boost their value relative to other investment options: bankruptcy-remoteness, which ensures that the mortgage assets in the trust (underlying the RMBS) are sheltered from bankruptcy by any entity in their chain of title, and favorable tax treatment as a real estate mortgage investment conduit ("REMIC") under the Internal Revenue Code, which allows the trust itself to avoid taxation.

124.

The residential mortgage securitization process is structured in a complex and detailed way to ensure that bankruptcy-remoteness and REMIC tax status are achieved. First,



securitization of mortgage loans begins with origination of a loan by a lender such as a bank,

finance company, or mortgage broker. Second, a financial institution (the "sponsor" or "seller")

assembles a pool of mortgage loans that it originated and/or it that it purchased from unaffiliated

third-party originating lenders. Third, the pool of loans is sold by the sponsor to a special-

purpose subsidiary (the "depositor") that has no other assets or liabilities. This step is executed to

segregate the mortgage loans from the sponsor's assets and liabilities. Fourth, the depositor sells

the loans to the trust, a single-purpose vehicle, which issues pass-through securities certificates

to investors entitling them to payment from performance of the underlying mortgage loans.

125.

The trusts are formed pursuant to, and are governed by, contracts called Pooling and

Servicing Agreements ("PSAs"), which are crafted to ensure that the benefits of mortgage

securitization flow to the trusts. In order for a trust to be bankruptcy-remote, there must be a

"true sale" of the mortgage loans, which means that all rights to the mortgage loan are

transferred to the trust so that no other entity in the chain of title could claim control of the assets

in the event of bankruptcy. True sale status also leads to RMBS trusts attaining higher ratings

from rating agencies than they otherwise would, which, in turn, means that the trust can charge a

higher issuing price for the securities relative to the interest rate paid on the securities. The

heightened value of the trust enables the trustee to charge premium prices to investors.

126.

RMBS trusts attract investors because of the representations made in the PSAs and

because the representations are co-sponsored and given integrity by the trustee. That is, the

trustee, who investors are led to believe is an independent and objective entity, acknowledges

receipt in the PSA of the mortgage loans in accordance with the depositor's representations of



conveying perfected mortgages. Without the assurances that the trustee supplies to securitization about reviewing mortgage files to ensure the presence of perfected mortgages, investors would look elsewhere.

127.

Banks, acting as RMBS trustees, represented that their trusts held mortgages with priority perfected security interests, when in fact they do not. Because the mortgage assignments had not been recorded, the security interests being passed to the trust were not priority, perfected liens as required by the contractual provisions of the PSA.

128.

In order for a trust to have REMIC status, substantially all of its assets must be qualified mortgages. 26 U.S.C. § 860D(a)(4). A qualified mortgage is defined as "any obligation (including any participation or certificate of beneficial ownership therein) which is principally secured by an interest in real property." *Id.* § 860G(a)(3). REMIC status is lost when too many non-qualified mortgages are in the trust. Retention of REMIC pass-through tax status is imperative because its loss would add significant costs to securitization, driving investors to more profitable investments.

129.

The PSAs contain express language to ensure that the transferor has all rights to the mortgage loans attached to the properties, free and clear of any encumbrance, and that all rights to the mortgage loans have been transferred to the trust, so that the transaction is considered a true sale and, accordingly, bankruptcy-remoteness is achieved and the trust maximizes its ratings. In any addition, some PSAs also assert that all of the mortgages are first-liens on one – to four – family properties. The express language also ensures that the mortgage loan is secured, so

D'AMORE LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

that REMIC tax status is achieved.

130.

In spite of language in PSAs stating that all rights to the mortgage loans have been transferred to the trusts free and clear of any encumbrance and that all of the mortgages in the Mortgage Pool were secured by first-liens, the mortgages and deeds of trust involving MERS remain listed in the Counties' property records in the name of the originating lenders of the mortgage loans and have not been recorded as assigned to the trusts. In order to satisfy the language in the PSA transferring *all rights* to the mortgage *free and clear of any encumbrance*, and to have perfected priority ("first-liens") and lawfully enjoy the benefits of proper securitization, trustees would have needed to record, or cause to be recorded, all mortgage assignments and the accompanying lien interests from originating lenders to the depositors and from the depositors to the trusts, and to pay the accompanying recording fees. Instead, trustees transferred notes into trusts they administered without consideration of whether the lien interests accompanying the notes had been recorded in the county land records in order to maintain first-lien priority.

131.

In the absence of a valid recorded assignment regarding each subsequent note holder and the lien interest following the note, legal title to the mortgage, priority, and the right to foreclose remain with the originating lender. In short, banks acting as trustees of RMBS failed to use the Counties' recording services to document the assignments necessary for proper first-lien securitization, yet trustees represented to the public and to RMBS investors that the mortgages they sold had the benefit of perfected, priority mortgages ("first-liens"), a benefit that could only be obtained by using the Counties' services to publicly record assignments.



132.

Trustee banks' failure to strictly comply with the terms of the PSA means that the mortgages at issue were never properly transferred to the trusts.

133.

Thus, although trustee banks craft the PSA's language for themselves, and the trusts, to reap the benefits of true sales, bankruptcy-remoteness, REMIC status, and other elements of properly formed RMBS trusts, trustee banks did not record all mortgage assignments from originating lenders to depositors and from depositors to trustees, which are preconditions for enjoying the advertised benefits.

134.

Defendants have argued that they could not have caused damage through their failure to record the mortgage assignments since no Oregon law requires them to record. However, as explained above, the securitizations that Shareholder Defendants assembled, held, and profited from, required properly recorded, adequately conveyed, perfected and prioritized security interests. Shareholder Defendants created a financial instrument that depended upon the recording system, represented that mortgages were perfected and properly conveyed, and were priced accordingly. Shareholder Defendants cannot now complain that the obligations that they undertook and promised, in order to claim tax and bankruptcy benefits under federal law, were not required by Oregon statute.

135.

In the securitization process, mortgage loans are typically conveyed at least three times, and must be conveyed at least two times. Trustees failed to record mortgage assignments and accompanying lien interests in real property and pay the accompanying fees to the Counties for



D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

all promissory notes in the trust attached to the mortgages filed with the Counties.

**H.    Defendants Knew What MERS Was (and Was Not) and What Their Legal and Business Relationships With MERS Were (And Were Not).**

136.

Defendants negligently, willfully and wantonly failed to perform any legal analysis or any adequate legal analysis regarding the ability of MERS to function as mortgagee, beneficiary, grantee, or nominee or as to whether MERS could (and would in fact) serve as their agent prior to their use of the MERS System.

137.

Defendants knew or should have known that MERS had no economic interest in the mortgage transaction and no economic, legal or recordable interest in the deeds of trust. Defendants also knew or should have known that MERS was not and could not be an agent or nominee based on their actual relationship with MERS. Nevertheless, Defendants knowingly recorded and assisted MERS in recording false and inaccurate instruments in the public record. Defendants' actions were required by membership rules as a condition of membership in MERS, which benefited Defendants by increasing their ability to originate and then sell MERS registered loans on the secondary market.

**I.    Defendants acted in concert to perpetuate the MERS Scheme.**

138.

Defendants committed repeated tortious acts, over two decades, in concert with each other or pursuant to a common design, through the creation, maintenance, and utilization of the MERS system, use of which required the tortious recording of false or inaccurate documents in

D'AMORE
LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

offices of the clerks of the Counties. Member Defendants, including local lenders, knowingly

provided substantial assistance to the efforts of their co-Defendants by aiding and abetting them

in their unlawful objective. Further, if Member Defendants had not participated in the MERS

system, Defendants' scheme would have failed because transfers of mortgages to Member

Defendants would have to occur outside of MERS, triggering the need for recording and thus

adding expense to and slowing the process of mortgage securitization.

139.

Shareholder Defendants created and maintained the MERS system for use by Member

Defendants. Through their use of the MERS system, Member Defendants gave substantial

assistance to Shareholder Defendants in causing the same tortious injuries to the Counties as

Shareholder Defendants.

140.

On July 18, 2012, the Court of Appeals in *Niday v. GMAC Mortgage* applied

longstanding Oregon law to MERS' assumptive claim that it is the beneficiary of a deed of trust

in Oregon and summarily rejected it as being in violation of longstanding Oregon law.[7] Despite a

binding decision by an Oregon Court that MERS was not and could not be a beneficiary or a

beneficiary of record, Shareholder and Member Defendants, individually and in concert with

MERS, continued to engage in fraudulent misrepresentation by recording, causing to be

recorded, or approving the recording of instruments which Defendants knew falsely stated that

MERS has a lien upon or interest in real property which MERS does not have.

---

[7] 251 Or. App. 278, 284 P.3d 1157 (2012), *aff'd*, 353 Or. 648, 302 P.3d 444 (2013).
{00263725;2}



4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

141.

Fully aware the MERS business model was invalid in the state of Oregon and having had their illogical and manufactured arguments dismissed by the Court of Appeals, Defendants once again set out to change the law in Oregon. In a blatant attempt to rewrite the definition of beneficiary and to delete the second half of the statutory definition, which Defendants knew MERS had never met and could never meet, Defendants introduced SB 804-2013 in the Oregon Legislature in March, 2013. The Bill revised "beneficiary" as follows:

> (2) "Beneficiary" means [a] the person named or otherwise designated in a trust
>
> deed as [the person for whose benefit a trust deed is given] the beneficiary, or the
>
> person's successor in interest[, and who is not the trustee unless the beneficiary is
>
> qualified to be a trustee under ORS 86.790 (1)(d)].

The Bill added the following provision:

> SECTION 6. (1) A beneficiary, including a beneficiary designated as an agent or
>
> nominee, may designate an agent or nominee to act on behalf of the beneficiary.

This attempt, as with the previous bill, failed. Similar legislation was again attempted in 2018 to retroactive excuse Defendants past conduct and again failed.

142.

On June 6, 2013, in *Brandrup v. Recontrust, N.A.,* the Oregon Supreme Court affirmed the Court of Appeals ruling in *Niday* that MERS is not and cannot be a beneficiary of a deed of trust in Oregon.[8] The Court confirmed in *Brandrup* that MERS is not and cannot be a beneficiary

---

[8] 353 Or. 668, 303 P.3d 301 (2013).

{00263725;2}

P a g e | **48 SECOND AMENDED COMPLAINT**



4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

as nominee of a deed of trust. In addition, the Oregon Supreme Court held that MERS can neither hold nor transfer legal title to a deed of trust.

143.

Relying on case law and statutes that predate the MERS concept, these rulings did not create a new definition of beneficiary or change the old definition; they merely applied the existing definition to MERS. The Courts' analyses reiterated existing Oregon law that parties cannot contract around statutes or create or change their legal status by private contract. As the Courts made clear, given MERS' role and lack of interest, MERS can neither hold nor transfer legal title to a deed of trust.

144.

The fact, as confirmed by Oregon courts, that MERS is not a beneficiary, beneficiary of record, or beneficiary as nominee in Oregon, certainly would have come as no surprise to Defendants. Defendants knew or spent years in contrived ignorance; fully aware of the high probability that MERS was not a beneficiary in Oregon and deliberately avoiding anything that would confirm that reality. What is surprising is the length of time that MERS was able to stay in business in Oregon by avoiding judicial scrutiny and by preventing the disclosure of the truth about what MERS knew, when it knew it, and the calculated risks MERS was willing to take for improper financial gain.

145.

Ignoring both the Court of Appeals and the Supreme Court of Oregon, Defendants, individually and in concert, continue to engage in fraud by recording, causing to be recorded, or approving the recording of instruments which Defendants know falsely state that MERS has a lien upon or interest in real property, which MERS does not have. Likewise, MERS continues its



fraudulent practices of calling itself the beneficiary, the beneficiary of record, and the beneficiary as nominee. Defendants, individually and in concert, have recently began recording, causing to be recorded or approved the recording of instruments which falsely and inaccurately state that MERS has a "nominee interest" in a deed of trust. Defendants knew and intended that the Counties would rely on Defendants' representations with the result that MERS was caused to be indexed as a grantee in documents recorded with the Counties and/or classified as a beneficiary or mortgagee in documents recorded with the Counties.

146.

Multnomah County filed a similar lawsuit against many of the same Defendants on December 20, 2012. The case survived the Defendants' numerous motions to dismiss, in a letter ruling of the Circuit Court for the County of Multnomah, on September 19, 2014, and subsequently settled.

## FIRST CLAIM FOR RELIEF

(Fraudulent Misrepresentation/Fraud/Deceit – Defendants)

147.

The Counties reallege and incorporate here by reference the allegations of paragraphs 1 – 146 above.

148.

Defendants intended that Counties detrimentally rely upon the false statements described above, and the Counties did so rely, by accepting such instruments for recording, thereby resulting in inaccurate county public land records in the Counties.

149.

Defendants, individually and in concert, undertook such conduct of making false



D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

statements to the Counties regarding their rights under the mortgages and deeds of trust and their relationships to the borrowers in the mortgages and deeds of trust issued by MERS members for the purpose of avoiding the recordation of subsequent conveyances in interest in real property in the Counties and payment of attendant filing fees.

150.

Defendants' fraudulent misrepresentations were material in causing Counties to record false information into the County land records and continue to be a proximate cause of damages to the Counties.

151.

The Counties would have received more in revenue from the recording fees than they would have spent in incremental costs to record these additional instruments.

152.

The Counties seek damages, direct and consequential for:

a.    Lost fees that would have been received in recording subsequent assignments, transfers, and other activities related to recorded instruments had Defendants not undertaken to avoid such recordation by engaging in the fraudulent misrepresentations described herein;

b.    Damages to and corruption of the records maintained by the Counties, including Statutory Grantor/Grantee Indexes; and

c.    The costs of obtaining complete and accurate information and in remediating the records maintained by the Counties so that such records accurately reflect collateral pledges of, liens upon, and interests in real property located in the Counties.

D'AMORE
LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

153.

Defendants' fraudulent misrepresentations and deceit set forth herein caused foreseeable harm to the Counties' public records, as the public records are now impaired by false, inaccurate, and incomplete records, in an amount that will exceed $50,000,000.

## SECOND CLAIM FOR RELIEF

(Unjust Enrichment/Quasi-Contract – MERS & MERSCORP)

154.

The Counties reallege and incorporate here by reference the allegations of paragraphs 1–153 above.

155.

Oregon law recognizes a claim for unjust enrichment where "one party has obtained benefits from another by fraud."[9] Unjust enrichment under Oregon law does not require that the party receiving the improper benefits is the same party that committed the original fraud—or even being aware that the benefit was improperly obtained. *Id*, 362 Or at 130-131, 440 P.3d at 920-921.

156.

As described above, the Counties conferred benefits upon Defendants, by maintaining a public recording system that permitted the creation of a perfected, priority, first-lien security interest in the real property upon the recording of an instrument.

157.

MERS and MERSCORP appreciated the benefit and recorded, caused to be recorded, or

---

[9] *Larisa's Home Care, LLC v. Nicholas-Shields*, 362 Or. 115, 133, 404 P. 3d 912, 921 (2017).



4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

approved the recording of instruments that falsely represent that MERS has a lien upon or interest in real property that MERS does not have. The Counties materially relied on the misrepresentations made by MERS and MERSCORP to record the false information into the Counties' land records to confer benefits upon MERS and MERSCORP.

158.

By its very design and purpose and through the filing of false or inaccurate records, MERS and MERSCORP sought to receive the benefits of the Counties' public records system, namely creation and maintenance of a perfected, priority, first-lien security interest in the real property associated with each filing. Thus, MERS and MERSCORP were and are aware of the benefits they have received through fraudulent misrepresentations made in the Counties' records.

159.

Because MERS and MERSCORP recorded, caused to be recorded, or approved the filing of false or inaccurate records, MERS Shareholders and MERS Members intended to and did make subsequent transfers, assignments, and other actions relating to instruments filed, registered, or recorded in the offices of the county clerks of the Counties without recording such transfers in the public land records of the Counties and without paying the attendant recording fees.

160.

The aforementioned transfers, assignments, and other actions were registered within the MERS System.

161.

By representing that use of the MERS system would allow MERS Members and MERS Shareholders to create and maintain perfected, priority, first-lien security interests in real



property situated in the Counties without the need to file records of subsequent transfers and

assignments, MERS and MERSCORP received the benefit of the Counties' public records

system, through the filing of false or inaccurate records, while avoiding paying fees that are

associated, by law, with creation and maintenance of perfected, priority, first-lien security

interests.

162.

MERS Members pay annual membership fees for the right to register mortgage loans on

the MERS System, a registration fee to register a mortgage loan on the MERS System, and

transaction fees for other services performed on the MERS System.

163.

MERS and MERSCORP benefited by receiving membership fees, transaction fees, and

other monetary benefits due to the initial intentional filing of false or inaccurate records and

subsequent use of the MERS System.

164.

But for the fraudulent misrepresentations above, members of the MERS System would

have been required by applicable state and federal law to obtain and maintain a perfected,

priority first-lien security interest by recording such subsequent transfers, assignments, and other

actions relating to instruments filed, registered, or recorded in the offices of the county clerks of

the Counties.

165.

But for the fraudulent misrepresentations above, in order to obtain and maintain a

perfected, priority first-lien security interest, and consistent with their own practices and the

requirements of securitizations, members of the MERS System would have recorded all



subsequent transfers or assignments of mortgages in the offices of the county clerk of the Counties.

166.

It would be unjust to allow MERS and MERSCORP to claim/retain the benefits conferred upon them (perfected, priority first-lien security interest) without requiring MERS and MERSCORP and their members who did not record to pay for that benefit.

167.

MERS and MERSCORP received fees from their members to track unrecorded transfers, assignments, and other actions relating to instruments that would otherwise be filed, registered, or recorded in the offices of the county clerks of the Counties.

168.

MERS and MERSCORP's conduct in using the MERS System to avoid the recording of fees while still using the priority conferred by the Counties' recording system has damaged the Counties' land records, Thus, MERS and MERSCORP's unjustly harmed Plaintiffs.

169.

The Counties seek restitution, damages and/or disgorgement from MERS and MERSCORP in an amount equal to the filing fees that would have been received by the Counties had all of the transfers, assignments, and other actions described herein been properly recorded to obtain a priority first-lien security interest, all fees received by MERS and MERSCORP for tracking the mortgage loans and mortgages tracked by MERS but not recorded in the public records of the Counties, and the cost to repair corrupted and inaccurate County record systems in an amount that will exceed $50,000,000.

{ 0 0 2 6 3 7 2 5 ; 2 }
P a g e | **55 SECOND AMENDED COMPLAINT**

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

## THIRD CLAIM FOR RELIEF

(Unjust Enrichment/Quasi-Contract – Shareholder Defendants & Member Defendants)

170.

The Counties reallege and incorporate here by reference the allegations of paragraphs 1 – 168 above.

171.

As described above, the Counties conferred benefits upon Shareholder Defendants and Member Defendants by maintaining a public recording system that permitted the creation of a perfected, priority, first-lien security interest in the real property upon the recording of an instrument.

172.

Shareholder Defendants and Member Defendants recorded, caused to be recorded, or approved and provided substantial assistance in the recording of instruments that falsely represent that MERS has a lien upon or interest in real property that MERS does not have. The Counties materially relied on the misrepresentations made by MERS and MERSCORP to record the false information into the Counties' land records to confer benefits upon MERS and MERSCORP.

173.

Through the filing of false or inaccurate records, Shareholder Defendants and Member Defendants sought to and did receive the benefits of the Counties' public records system, namely creation, appearance and maintenance of a first-lien perfected security interest in the real property associated with each filing.

D'AMORE
LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

174.

In addition, the action of each Shareholder Defendant and Member Defendant was designed to facilitate the securitization process by permitting the rapid transfer of mortgages, without recording, while meeting the requirements to obtain bankruptcy remoteness and REMIC-related tax exemption, thereby increasing the profits from making these loans. Thus, Shareholder Defendants and Member Defendants were and are aware of the benefits they have received.

175.

Shareholder Defendants and Member Defendants recorded, caused to be recorded, or approved and provided substantial assistance in the filing of false or inaccurate records to avoid paying fees to the Counties associated with recording subsequent transfers, assignments, and other actions relating to instruments filed, registered, or recorded in the offices of the county clerks of the Counties.

176.

Shareholder Defendants devised, maintained, and utilized the MERS system in order to create, maintain, and transfer perfected, priority, first-lien security interests in real property situated in the Counties without the need to file records of subsequent transfers and assignments and conveyances of an interest in real property. Thereby, Shareholder Defendants received the benefit of the Counties' public records system, through the filing of false or inaccurate records, while avoiding paying fees that are associated, by law, with the creation and maintenance of priority, first-lien perfected security interests.

177.

Member Defendants maintained and utilized the MERS system and/or provided substantial assistance in the maintenance and regulation of the MERS system in order to create,



D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

maintain, and transfer priority, first-lien perfected security interests in real property situated in the Counties without the need to file records of subsequent transfers and assignments and conveyances of an interest in real property. Thereby, Member Defendants received the benefit of Counties' public records system, through the filing of false or inaccurate records, while avoiding paying fees that are associated, by law, with the creation and maintenance of, priority, first-lien perfected security interests.

178.

Member Defendants' recordation in the name of MERS enabled MERS Members to represent in agreements executed as part of the securitization process that they had good title to or were transferring good title to the mortgages free and clear of any pledge, lien, encumbrance, or security interest. This priority permitted the MERS Members to represent that the trusts holding the mortgage pools were bankruptcy-remote and subject to REMIC status.

179.

But for the misrepresentations contained in the original instruments, Shareholder Defendants and Member Defendants would have been required by applicable state and federal law to obtain and maintain a perfected, priority first-lien security interest by recording subsequent transfers, assignments, and conveyances in the offices of the county clerks of the Counties.

180.

But for the misrepresentations above, Shareholder Defendants and Member Defendants would have been required by their own internal policies to obtain and maintain perfected, priority first-lien security instruments by recording subsequent transfers, assignments, and conveyances of interest in real property in the offices of the county clerks of the Counties.


D'AMORE LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

181.

The Counties seek restitution, damages, and/or disgorgement from Shareholder Defendants and Member Defendants in an amount equal to all of their forgone filing fees, which were saved by not recording subsequent transfers, assignments, and other conveyances relating to instruments initially filed, registered, or recorded in the offices of the county clerks of the Counties; other savings realized in not having to prepare or file those documents; the increased value of benefits received due to the misrepresentations in the Counties' records in the securitization process, and all other benefits received by Defendants from their use of MERS and participation in the MERS scheme. Such damages reflect the extent to which MERS Defendants have been unjustly enriched and are in an amount that will exceed $50,000,000.

182.

Defendants, through their conduct detailed above, have shown a reckless and outrageous indifference to a highly unreasonable risk of harm and have acted with a conscious indifference to the health, safety and welfare of others. The MERS scheme, in which each Defendant participates, has destroyed the public record that both the public and government rely upon for purposes as varied as identifying a homeowner's current lender to government officials identifying the proper party for code enforcement, and set up an inadequate alternative private system. In the words of one legal expert: "Now, about 60 percent of the nation's residential mortgages are recorded in the name of MERS Inc., rather than the bank, trust, or company that actually has a meaningful economic interest in the repayment of the debt. For the first time in the nation's history, there is no longer an authoritative, public record of who owns land in each county." The MERS scheme was an accomplice to the rapid securitization of bad loans that caused the great recession, stripped billions of dollars out of the American and world economies,

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

and took thousands of people's homes from them in Oregon. This conduct entitles Counties to an award of punitive damages in an amount to be determined by a jury.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray for the following:

a.      For judgment against Defendants and in favor of Plaintiffs on all causes of action asserted in this Complaint in an amount of $50,000,000, subject to amendment before trial;

b.      For restitution and disgorgement of all monies due and owing to Plaintiffs;

c.      For actual and exemplary damages;

d.      For punitive damages;

e.      For costs of the suit incurred herein;

f.      For pre-judgment interest to the extent allowed by law;

g.      For such other and further relief as this Court may deem equitable, just, and proper.

Dated this 16th day of March, 2018.

                                        D'AMORE LAW GROUP, P.C.


                                        By: /s/ Thomas D'Amore
                                        Thomas D'Amore, OSB #922735
                                        S. Michael Rose, OSB #983388
                                        D'AMORE LAW GROUP, P.C.
                                        4230 Galewood St., Ste. 200
                                        Lake Oswego, OR 97035
                                        tom@damorelaw.com
                                        michael@damorelaw.com



Nicholas A. Kahl, OSB #101145
NICK KAHL, LLC
209 SW Oak Street, Suite 400
Portland, OR 97204
Tel: 971-634-0829
Fax: 503-227-6840
nick@nickkahl.com

John E. Herrick (*pro hac vice*)
MOTLEY RICE, LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216.9100
Fax: 843-216-9450
jherrick@motleyrice.com

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333